# EXHIBIT D

Photo by Getty Images

# FEDERAL JUDGES' FINANCIAL CONFLICTS ADD TO MISTRUST OF THE JUDICIAL SYSTEM

by **Tanner Stening**    January 11, 2022

A recent **Wall Street Journal** investigation found that over the last decade, 131 federal judges failed to recuse themselves in hundreds of cases that involved their own financial interests.

Chief Justice of the Supreme Court John Roberts, in his **year-end review** of the federal judiciary, said the **report**'s findings indicate a "serious problem of inadequate ethics training," especially for those judges who had numerous violations. The conflicts of interest primarily include judges hearing cases involving their or their families' stock holdings, which ultimately tainted some 685 court cases.

Given the rising concerns that the federal judiciary is becoming increasingly politicized, the newspaper's findings are deeply troubling, says **Martha Davis**, university distinguished professor of law at Northeastern, adding that the violations only "compound the lack of trust that the federal judiciary seems to be breeding."

"What's at stake here is a lot," Davis says. "We have a judiciary for various reasons already losing the trust of the American people, and the evidence that federal judges are hearing cases that they have a direct financial interest in only makes things worse."

One of the primary mechanisms for alerting the courts about potential conflicts is through software that screens for them. **The computerized system** itself was implemented after a 2006 Washington Post investigation discovered a rash of ethics violations in the federal courts.

But the more recent Wall Street Journal investigation found that the software isn't foolproof, requiring more awareness from judges.

"Judges are expected to know



themselves, and not to rely on some kind of mechanism or computer system" to catch these conflicts, Davis says. "And they're supposed to be aware of what their own assets are."

The Journal reports that some of the judges who hadn't recused themselves in the cases blamed "flawed internal procedures," including an instance in which a federal court official in New York said the screening software missed a conflict because the system did not recognize the name of the company in question.

All federal judges are beholden to a judicial code of ethics, codified in a 1974 law, requiring that they be informed of their financial interests, and disqualify themselves if faced with a case in which they, their spouses, or minor children own a **"legal or equitable interest, however small"** in one the parties. Every state has a code of conduct that applies to judges also, Davis says, but the exact rules can differ state by state.

Attorneys involved in a case can act as a check, should they discover a conflict. But, even then, there aren't ways of compelling judges to disqualify themselves.

"There is a check where, in theory, litigants who discover this sort of

**TEXAS USED CITIZENS AS BOUNTY HUNTERS IN ITS ABORTION BAN ENFORCEMENT. CAN CALIFORNIA DO THE SAME FOR GUN CONTROL?**

READ MORE

conflict can move to have the judge recused," she says, "but the problem is recusal is often in the hands of a judge, and it's difficult from a litigator's perspective to decide when to raise the issue when a judge isn't approaching it in a serious way."

Davis says one potential solution is to require that judges put their assets in a blind trust—a common vehicle used by politicians and other public figures to avoid conflicts.

**Congressional oversight** of federal judges has always been relatively limited, which has meant that the federal judiciary is to a large extent charged with policing itself—a task for which they are not well equipped, says **Jeremy Paul**, professor of law and former dean of Northeastern's School of Law.

"[Chief Justice John Roberts] is worried there will be pressure on the courts to turn over the policing mechanism to the other branches, which he doesn't want because he wants to maintain independence for the judiciary," Paul says.

"The much bigger problem," he continues, "is the composition of the federal judiciary, which now tends to have a very strong pro-business background and orientation. The fact that you're getting judges ruling on their business is also a product of who is being picked for those judgeships."

**For media inquiries**, *please contact media@northeastern.edu.*

**DID YOU LIKE THIS STORY?**



**SHARE**

---

**TOPICS**

Law, business dealings, Chief Justice John Roberts, conflict of interest, ethics, federal judges, federal judiciary, Jeremy Paul, law, Martha Davis, Northeastern School of Law, recusal, recuse, SCOTUS, stockholdings, stocks, supreme court, The Wall Street Journal

**CREDITS**

Tanner Stening.

The gold domed Vermont State House in the capital city of Montpelier. Photo by Brian Eden/Getty Images

# CAN STATES PRESERVE ACCESS TO ABORTION IF *ROE V. WADE* IS OVERTURNED?

by **Tanner Stening**    February 10, 2022

As the battle over reproductive healthcare rages at the federal level, some states are taking matters into their own hands. States such as **Vermont** are trying to enshrine access to abortion, contraceptives, and reproductive care in their own constitutions.

One such measure, Proposal 5, passed the Vermont House of Representatives on Tuesday and now will go before the voters in November, where it's expected to receive overwhelming support from Vermonters. If it does pass, Vermont would become **the first state** to guarantee these protections via its constitution, according to the Washington Post.

More and more state legislatures are mobilizing in anticipation of the Supreme Court's decision on an **abortion ban in Mississippi**, which directly threatens the rights spelled out in *Roe v. Wade*. Some states, such as **Texas**, have implemented new, near-total abortion bans, while others are trying to shore up abortion protections.

All of these legislative efforts anticipate a "post-Roe" world, where "the question of whether or not abortion should be legal will go back to the states," says **Jeremy Paul**, professor of law and former dean of Northeastern's School of Law.

But for those states looking to uphold abortion rights, even a constitutional amendment is not completely foolproof, Paul says. If anti-abortion politics took root in Vermont, for example, lawmakers could simply repeal the amendment and enshrine their own restrictions, he says.

"By far the most important point is



continuing to explain to people why it should be *women*, and not government agents, who make the fundamental decision about whether they want to become mothers or not," Paul says.

*Roe v. Wade* established a person's right to an abortion in 1973, and has been reaffirmed by the high court twice since. Those protections are thrown into question in the Supreme Court's ongoing review of *Dobbs v. Jackson Women's Health Organization*, which the court has yet to issue a ruling on—though the justices have signaled that they are poised to overturn portions of *Roe v. Wade* when the time comes. That could be as late as June, when the current session ends, or as soon as next week.

There have been other constitutional amendments proposed either to restrict or preserve access to abortion in different states. **Pennsylvania state lawmakers**, for example, are looking to prohibit the practice outright through a proposed amendment, restricting abortion even in cases of rape, incest, or life-threatening conditions, if *Roe v. Wade* is overturned.

And a dozen states already have laws on the books that would immediately enact abortion restrictions should federal protections be dismantled. These dormant, presently unenforceable laws—called "**trigger laws**"—may become enforceable the moment the Supreme Court issues its decision in the Mississippi case.

*Texas used citizens as bounty hunters in its abortion ban enforcement. Can California do the same for gun control?*    **READ MORE**

It's "completely expected" that as the Supreme Court "backs away from precedent," the states are responding in turn with their own laws and constitutional amendments, says **Martha Davis**, university distinguished professor of law at Northeastern.

"What's happening in Vermont is interesting for sure," Davis says. "There are already ten states that have constitutional protections for abortion, but what's unique about the Vermont amendment is it's specifically targeted to abortion."

Davis says the process taking place in Vermont is not merely symbolic.

"It would be very difficult to reverse something like a constitutional amendment," she says.

*For media inquiries*, please contact media@northeastern.edu.

**DID YOU LIKE THIS STORY?**



**SHARE**

**TOPICS**

Law, abortion, Jeremy Paul, Martha Davis, Mississippi abortion ban, Northeastern School of Law, Northeastern University, Pennsylvania, Roe v. Wade, SCOTUS, trigger laws, Vermont

---

**CREDITS**

Tanner Stening.

© 2022 Northeastern University